Woman's Union Missionary Society of America, etc., *et al.*

*v.*

George O. Mead *et al.*

*Filed at Springfield January 18, 1890.*

1. Wills — *after-acquired estate — whether it will pass by the will.* Whether after-acquired real estate will pass by a will, depends upon the testator's intention. If no such intention appears from the will, it will not pass; but such intention is sufficiently shown by the language, "I bequeath all my property, real and personal, wherever the same may be," etc. It will be presumed, when the contrary does not appear, that a party deliberately making a will does not intend to leave anything undisposed of.

2. It is not necessary, in order to pass after-acquired property by will, that the testator should have a specific intent to dispose of property which he might thereafter inherit or otherwise acquire, but it will be sufficient if he manifestly intends that "all the rest, residue and remainder" of his estate, "both real and personal," owned by him *at the time* of his death, shall pass, no matter how or from whom obtained.

3. A testatrix, after having made various specific devises and bequests, among which was a bequest of $15,000 to a sister, provided that in case of the death before the testatrix of any legatee, without issue, his or her legacy should fall into the residuary estate mentioned in the will, and then gave, devised and bequeathed "all the rest, residue and remainder of her estate, both real and personal," to her executors, in trust, to pay the income to such sister during her life, and after her death to divide such residuary estate between six corporations therein named. The sister died before the testatrix, leaving no issue, whereby the legacy to her lapsed, and the testatrix inherited a large property from such sister: *Held,* that all the property thus acquired by the testatrix passed under her will, under the clause disposing of the residuum.

4. Same — *residuary clause — specific purpose appointed — whether a limitation upon the use — and when the surplus may be applied.* A testatrix, after providing for the payment of her debts, and certain specific legacies, devised all the rest and residue of her estate to her executors, in trust, to be equally divided between six corporations, including a hospital in Chicago, and then directed, that "said share of my residuary estate herein devised to the Hahnemann Hospital of Chicago, Illinois, is given upon condition that the same shall be used for the endowment of a bed in said hospital in memory of, etc., and in the erection in said hospital of a mural brass tablet," etc.: *Held,* that the devise to the hospital was not limited to the amount necessary to endow one bed and

erect such tablet, nor was the cost of such endowment and tablet a limit on the amount devised to the other beneficiaries.

5. While the court is of opinion that any surplus remaining after the specific conditions mentioned shall be performed, must be used for the benefit of the hospital department of the institution, yet the determination as to the purposes to which such surplus shall be applied should await the ascertainment of the amount of it, and until the claimant can be heard on the question.

6. SAME—*identity of legatee or devisee—mistake in name—uncertainty of description—extrinsic evidence.* A mistake in the name or description of a legatee or devisee, whether an individual or a corporation, will never render a bequest void, if the name and description used in the will, as applied to the facts and circumstances proved, will identify such person or corporation.

7. If the name or description used in a will does not designate with precision any person, but, when the circumstances come to be proved, so many of them concur to indicate that a particular person was intended, and no similar conclusive circumstances appear to distinguish and identify any other person thus shown to be intended, such person will take.

8. Whenever parol evidence becomes necessary to remove an uncertainty as to the devisee or legatee, the court may inquire into every material fact relating to the person who claims under the will, and to the property and to the circumstances of the testator and his family and affairs, for the purpose of identifying the person intended by the testator. Every claimant under a will has the right to require that the court, in the execution of its office, shall, by means of extrinsic evidence, place itself in the situation of the testator.

9. On a question of the identity of certain corporations claiming to have been intended as the objects of the testator's bounty, it is competent to prove, on the hearing, their corporate existence, and the objects and purposes for which they were organized ; the knowledge, if any, which the testator had of them, and his feelings toward and relations with them ; the name or names by which he or others were accustomed to designate them ; that no other corporations or societies corresponding to the name or description given them in the will, existed at the time it was executed ; his family, church and social relations,—and, in short, every fact and circumstance surrounding him and the claimants which will aid the court in reaching a conclusion as to his motives and purposes in using the names or descriptions in question. If such evidence makes it clear who were intended as the objects of the bounty, then the beneficiaries are expressed with sufficient certainty.

10. In this case, the facts and extrinsic evidence are given, from which the court identifies and finds the several corporations to which

bequests were made, but whose corporate names were not correctly given in the will.

11. COSTS—*on bill for construction of will.* As a general rule, when a will is so ambiguously or indefinitely drawn as to make it necessary for the executor to file a bill to get a construction of the same, the costs of the litigation must be borne by the estate, and the general residue is the primary fund for the payment of such costs.

12. SOLICITOR'S FEES—*on bill to construe will.* The amounts allowed by the court to the various parties to a bill to construe a will, for their solicitors' fees, is generally a matter of discretion with the court; and when no more is done than to fix the amount the estate shall pay to each of the parties, leaving the reasonableness of solicitors' fees open to adjustment between them and their clients, this court will not review the action of the court below.

APPEAL from the Circuit Court of Cook county; the Hon. M. 'F. TULEY, Judge, presiding.

Phebe L. Smith died December 24, 1885. She left surviving as her only heirs, James Ogden, an uncle on her mother's side, and Benjamin Franklin Smith, an uncle on her father's side. Subsequently James Ogden died, leaving a will, by which George O. Mead was made executor and sole residuary legatee. At the time of filing the bill in this cause, George O. Mead and Benjamin Franklin Smith represented, and they now represent, all the inheritable interests, if. any, in the estate of Phebe L. Smith.

January 24, 1884, Phebe L. Smith executed a will, making Voluntine C. Turner, George O. Mead and Alexander C. McClurg the executors thereof and trustees thereunder. This George O. Mead is the same person who is the executor of and residuary legatee under the will of James Ogden, deceased. The will of Phebe L. Smith was duly probated in the probate court of Cook county, Illinois, and George O. Mead and Alexander C. McClurg qualified thereunder. Voluntine C. Turner declined to act. Her will directs, first, that all her debts and funeral expenses be paid as soon as may be after her death; second, a bequest to her only sister, Eliza S. Turner, of $15,-000 is made; third, a like bequest to her brother-in-law, Vol-

untine C. Turner, husband of her said sister, Eliza S.; fourth, a bequest to her executors of $1000 in trust, to be expended on a family monument; fifth, a bequest of $100, each, to Henry E. Ogden, William W. Ogden, Edward Ogden and Charles M. Smith; sixth, to her said sister, Eliza S. Turner, all personal effects in her house or possession "at the time of my decease," alabaster clock, watch, rings, jewelry, personal ornaments and wearing apparel, and pew in the Fourth Presbyterian Church, in Chicago; seventh, a bequest to George O. Mead, a cousin, of $500; eighth, to Henry E. Ogden $1000, and in case of his death "before my own death," to his brothers, Edward Ogden and Lyman Ogden, share and share alike; ninth, a bequest to Sophia G. Gardner of $1000; tenth, a bequest to Laura H. Smith of $1000; eleventh, a bequest to Adeline S. Mead of $500; twelfth, to Henry E. Ogden "all articles of household furniture, books, works of art and other chattels and effects which shall, at my decease, be in his house or in his possession;" thirteenth, to "personal friends, such articles of personal property, furniture, ornaments, etc., belonging to me, as they respectively may have in their possession at the time of my decease, excluding securities and property held by me as investments." The fourteenth, fifteenth and sixteenth clauses are as follows:

"*Fourteenth*—In case of the death before me of any legatee herein named, (except Henry S. Ogden,) I give and bequeath his or her legacy to the issue of the legatee so dying, share and share alike; and in case of the death before me of any legatee herein named, (except Henry S. Ogden,) without issue, I direct that his or her legacy shall fall into my residuary estate.

"*Fifteenth*—I give, devise and bequeath all the rest, residue and remainder of my estate, both real and personal, to my executors, hereinafter named, and to the survivors and survivor, successors and successor of them, in trust, to pay the income of the same to my sister, Eliza S. Turner, for and during the term of her natural life, and after her death, to divide such

residuary estate equally between the following corporations, associations and societies: The Chicago Foundlings' Home, the Woman's Union Mission (of Chicago), the Home for Incurables at Chicago, the Chicago Training School for Nurses, the Fund for Disabled Ministers of the Presbyterian Church, the Hahnemann Hospital at Chicago, Illinois. Said share of my residuary estate herein devised to the Hahnemann Hospital of Chicago, Illinois, is given upon condition that the same shall be used for the endowment of a bed in said hospital in memory of my father, Henry Smith, and in the erection in said hospital of a mural brass tablet, measuring nine and one-half inches by seventeen inches, whereon shall be inscribed in plain Roman letters, the following: 'In Memoriam—Henry Smith. As thy day, so shall thy strength be. December 25, 1866.'

"*Sixteenth*—I hereby nominate, constitute and appoint Voluntine C. Turner, of Chicago, and my cousin, George Ogden Mead, of Walton, in the State of New York, and Alexander C. McClurg, of Chicago, Illinois, or such of them as may qualify, executors of this my last will and testament, and hereby give them full power and authority to manage my estate in their discretion, and to grant, bargain, sell and convey my real property, or any part or parts thereof, and to contract for the sale and disposition of the same, upon such terms of payment and for such sum or sums of money as to my said executors may seem meet and proper; and also to demise and let, for such term and upon such leases as to my said executors may seem best, all and any portion or portions of the realty belonging to my estate, and also to improve all or any parts of my estate, by grading, constructing or building up the same, or otherwise, as to my said executors may seem best: *Provided, however,* that they be limited in their powers to incur liabilities for account of my estate, to a sum not exceeding twenty per cent of the value of said estate, intending hereby to confer upon my said executors all such powers, not herein

enumerated, as may be needful for the full and convenient execution of this my last will and testament, and necessary for the easy management of my estate; and I hereby direct, that in case the legacies hereinbefore named can not, in the judgment of my said executors, be paid immediately after my decease, without sacrifice to my estate, that the time for the payment of the same shall be left to the discretion of my said executors, and that they shall be the judges of the time within which the same shall be paid."

The seventeenth and last clause provides that her executors shall not be liable for the acts of each other in the settlement of her estate, but each for his own conduct.

This will was executed in the city of New York, although Miss Smith at the time was, and had for many years been, a resident of the city of Chicago. She wrote the will herself, assisted, perhaps, by a lady friend,—Miss Wheeler. Prior to the death of testatrix, her sister—Mrs. Eliza S. Turner—died without issue.

All debts and specific legacies having been fully paid, and the residuary estate being ready for distribution, it was ascertained by the executors that four of the residuary beneficiaries were misnamed, and they filed this bill, making the corporations and societies claiming to be intended by the testatrix by the names she used in the fifteenth clause, and also her heirs-at-law, parties defendant. "The Chicago Foundlings' Home" and "The Home for Incurables at Chicago," both corporations existing in the city of Chicago, appeared and claimed the legacies willed to them by their proper names. "The Woman's Union Missionary Society of America for Heathen Lands," a corporation organized under the laws of the State of New York, and an incorporated branch thereof called "The Chicago Branch of the Woman's Union Missionary Society of America for Heathen Lands," claimed the legacy willed to the Woman's Union Mission (of Chicago.) "The Illinois Training School for Nurses," a corporation existing in the city of Chicago, or-

ganized under the laws of this State, claimed the legacy willed to "The Chicago Training School for Nurses." "The Presbyterian Board of Relief for Disabled Ministers and the Widows and Orphans of Deceased Ministers," a corporation organized under the laws of the State of Pennsylvania, claimed the share left to "The Fund for Disabled Ministers of the Presbyterian Church;" and "The Board of Trustees of the Hahnemann Medical College," a corporation existing under the laws of this State, in the city of Chicago, claimed the legacy willed to "The Hahnemann Hospital at Chicago." Each of these corporations also claimed, by its answer, that in case any one or more of them should fail to establish its right to the legacy claimed by it or them, such legacy or legacies should be divided equally between those whose right should be established.

The answer of Benjamin F. Smith raises the issues insisted upon by himself and George O. Mead, as heirs-at-law, against these several corporation claimants, viz.: First, testatrix, in the residuary clause of her will, attempted to give the exact names of the residuary devisees; second, whether names or descriptions, they are not sufficient to identify claimants; third, as to the fund for disabled ministers of the Presbyterian church, and the Hahnemann Hospital, there is no latent ambiguity; fourth, that the particular real estate acquired by testatrix after making her will, through the death of her sister, Mrs. Turner, was not conveyed by said will; fifth, that the $15,000 legacy bequeathed to Mrs. Turner did not, upon her death, fall into the residue of the estate; sixth, that the condition on which the legacy to the Hahnemann Hospital was made, to the endowment of a bed, and the erection of a mural brass tablet in memory of Henry Smith, is a measure of the amount intended by testatrix to be given to each of the residuary devisees, under said fifteenth clause; seventh, that even had claimant societies been properly named, the ultimate beneficiaries under said residuary devises were too uncertain and indefinite to take.

The cause having been referred to the master, he reported the evidence, with his findings, sustaining the claim of each of the said corporation claimants. He also found that, by her last will, testatrix disposed of all the estate owned by her at the time of her death, and that after the payment of specific legacies, all the residue of said estate vested in the executors for the purpose set forth in the fifteenth clause of said will. On exceptions to this report, the court held that the proof failed to sustain the claim of the Woman's Union Missionary Society of America for Heathen Lands, and its Chicago branch, and decreed one-sixth of said residuary estate to the said heirs-at-law. Each of the other legacies was sustained, and the claimants held to be entitled thereto. The executors were ordered to make distribution of said estate accordingly. The Hahnemann Medical College was required to endow one or more beds in its hospital, and to erect a mural brass tablet, in accordance with said will; and as to this share it was decreed, that if it should prove to be more than sufficient to endow one bed in said hospital and erect said tablet, the surplus should be used to endow other beds. The master's report, as to the estate disposed of by said will, was approved, and the decree provided that all the estate should vest in the executors "*whensoever acquired,*" for purposes of distribution under said will.

The decree also provided that the executors should pay the costs of the proceeding out of the estate, the matter of solicitors' fees being referred to the master to find a reasonable amount to be allowed the solicitors of the respective parties, and on the coming in of his report, the court found that the bringing of the bill and all parties thereto into court was necessary in order to obtain a construction of said will before distribution under the fifteenth clause could be made, and that in equity an allowance should be made to the solicitors who had appeared and aided in the said construction; but it is stated in said decree, "that the court does not intend by its allowance to limit the value of services rendered, or to settle accounts of

solicitors between them and their clients, *but makes the allow-ance as an equitable proportion of the expenses to be borne by the estate.*" Various sums were then fixed as an allowance to each of said corporation claimants, to the executors, and each of said heirs-at-law, and to these allowances each of said parties excepted. Under these exceptions, the right of the court to allow any solicitors' fees to be paid out of the estate, the right to allow any fees except to the executors, the reasonableness of fees allowed, and the fairness of the proportionate allowance to each of the parties, is questioned.

To the decree, generally, exceptions were entered by "The Woman's Union Missionary Society of America for Heathen Lands," and its Chicago branch, the board of trustees of "The Hahnemann Medical College," and the heirs-at-law. Under these assignments of error, the missionary society questions the correctness of the decree below in disallowing its claim to one-sixth of the residuum of said estate. Also, in refusing to allow it the full sum of $3880 for solicitors' fees, being the sum reported by the master as reasonable, and in reducing the same to $1100. Also, in allowing any solicitors' fees whatever to the heirs-at-law. The Hahnemann Medical College objects thereto in so far as it gives the one-sixth of said estate willed to the Woman's Union Mission, to the heirs-at-law, instead of dividing it equally among the other five corporation claimants. Also, in decreeing, that if its one-sixth should exceed the amount necessary to endow one bed in said hospital and erect said tablet, it should endow other beds to the extent of said legacy.

Numerous questions are raised by the heirs, the substantial ones being, that the court below erred in deciding that all the property of testatrix passed under her will, and that the residuum thereof became vested in her executors under the fifteenth clause thereof; also in finding that the five corporation claimants, other than the missionary society, were the corporations intended by testatrix in her will, and giving to each of

them one-sixth of her residuary estate; also in decreeing, that if the share of the medical college should exceed the amount necessary to endow one bed in its hospital, the balance should be used in endowing other beds, to the extent of said share; also in allowing to each of said five corporations held entitled to share in said estate, one-sixth of the residuum thereof, instead of limiting their rights, in amount, to the amount necessary to endow one bed in said hospital and erect therein said mural brass tablet. They also file cross-errors questioning the correctness of the decree below in allowing solicitors' fees to the executors and other parties than themselves. Cross-errors are also filed by each of the five successful corporation claimants, questioning the decree in so far as it gives the undivided share willed to the Woman's Union Mission (of Chicago), to the heirs-at-law.

Mr. THOMAS S. McCLELLAND, for the missionary societies and Home for Incurables:

A misnomer in a will, in designating the society or organization intended to be benefited by a legacy, will not defeat the bequest, if it can be reasonably shown what society in fact was contemplated by the testator. *Gilmore* v. *Stone*, 120 U. S. 586, and cases cited; *Lefevre* v. *Lefevre*, 59 N. Y. 440; *Bradley* v. *Rees*, 113 Ill. 332; *Decker* v. *Decker*, 121 id. 341; 1 Jarman on Wills, (R. & T. ed.) 411 n, 760 n; Theobald on Wills, (2d ed.) 297, and cases cited; Story's Eq. Jur. secs. 1169, 1170; 2 Perry on Trusts, sec. 730; *Butler* v. *Tract Society*, 23 Vt. 336; *McAllister* v. *McAllister*, 46 id. 272; *Howard* v. *Peace Society*, 49 Me. 288; *Trustees* v. *Peaslee*, 15 N. H. 317; *Newell's Appeal*, 24 Pa. St. 197; *Missionary Society's Appeal*, 30 id. 425; *Maunds' Admr.* v. *McPhail*, 10 Leigh. 199; Whiteford on Charities, 49; Boyle on Charities, 130; *Brewster* v. *McCall's Devisees*, 15 Conn. 274; *McBride* v. *Elmer's Exrs.* 2 Hal. Ch. 107; *DeCamp* v. *Dobbins*, 2 Stew. Eq. 36; *Goodell*

v. *Union Association,* id. 32; *Lanning* v. *Sisters,* 35 N. J. Eq. 392; *Banks* v. *Phelan,* 4 Barb. 89.

To the same effect, and that parol evidence may be introduced to explain or remove the latent ambiguity: *Lefevre* v. *Lefevre,* 59 N. Y. 440; *Dougherty* v. *Purdy,* 18 Ill. 206; *Patch* v. *White,* 117 U. S. 210; *Maunds' Admr.* v. *McPhail,* 10 Leigh, 199; *Newell's Appeal,* 24 Pa. St. 197; *Thomas* v. *Stevens,* 4 Johns. Ch. 607; *Hart* v. *Marks,* 4 Bradf. 161; *Wood* v. *White,* 32 Me. 340; *Meadows* v. *Barry,* 2 Ga. Dec. 80; *Knight* v. *Bunn,* 7 Ired. 77; Whitford on Charities, 49, and cases cited; Boyle on Charities, 130; *McBride* v. *Elmer's Exrs.* 2 Hal. Ch. 107; *DeCamp* v. *Dobbins,* 2 Stew. Eq. 36; *Goodell* v. *Union Association,* id. 32; *Leaming* v. *Sisters,* 35 N. J. Eq. 392; Wigram on Wills, pp. 128, 129, 174, pl. 166, 200, 201; *Baylis* v. *Attorney General,* 2 Atk. 239; *Abbott* v. *Massie,* 3 Ves. 148; *Duke of Dorset* v. *Hawarden,* 3 Curt. 80; *Doe* v. *Hubbard,* 15 Ad. & El. 248; *Newbolt* v. *Pryce,* 14 Sim. 354; *Lee* v. *Paine,* 4 Hare, 251; *Doe* v. *Chichester,* 4 Dow's P. C. 65; Greenleaf on Evidence, 290; *Tilton* v. *Society,* 60 N. H. 377; *Hinckley* v. *Thatcher,* 139 Mass. 477.

A devise to one by the name he is generally known or named or called by the testator, is valid, and extrinsic evidence may be offered to show the fact. *Minot* v. *Boston Asylum,* 7 Metc. 416; *First Parish* v. *Cole,* 3 Pick. 232; *Parsons* v. *Parsons,* 1 Ves. Jr. 266; *Abbott* v. *Massie,* 3 id. 148; *Powell* v. *Biddle,* 2 Dall. 70; *Foster* v. *Walter,* Cro. Eliz. 106; *Mayor* v. *Burgesses,* 10 Coke, 123.

A devise to a corporation need not state its corporate name. It is sufficient that the devisee or legatee is so defined as to be distinguished from any other. *Institution for the Blind* v. *How's Exrs.* 10 N. Y. 88; *Carmoden* v. *Clarke,* Hob. 29 a; *De Ayray's case,* 11 Coke, 20 b; *Queen's College* v. *Sutton,* 12 Sim. Ch. 441; *Taylor* v. *Lolen,* 38 N. J. Eq. 91; *St. Luke's Home* v. *Association,* 52 N. Y. 191; *Halmer* v. *Mead,* id. 332; *Missionary Society's Appeal,* 30 Pa. St. 425; *Lefevre* v. *Lefevre,*

59 N. Y. 434; *Straw* v. *Societies,* 67 Me. 493; *Minot* v. *Boston Asylum,* 7 Metc. 416; *Howard* v. *Peace Society,* 49 Me. 288; *Hinckley* v. *Thatcher,* 139 Mass. 477; *First Parish* v. *Cole,* 3 Pick. 232; 1 Jarman on Wills, 378; Angell & Ames on Corp. 99, 100; 1 Redfield on Wills, 587, sec. 40; *Patch* v. *White,* 117 U. S. 210; Jarman on Wills, 364, 365; Roper on Legacies, (4th ed.) 297; Williams on Executors, 988, 1032.

The intention of the testatrix must govern. *Roundtree* v. *Talbott,* 89 Ill. 246; *Updike* v. *Tompkins,* 100 id. 406; *Blake* v. *Hawkins,* 98 U. S. 315; *Robinson* v. *Orphan Asylum,* 123 id. 702; *Taubenhan* v. *Dunz,* 125 Ill. 529.

A court will never construe a devise void, unless it is so absolutely dark that the testator's meaning can not be discovered. *Minshall* v. *Minshall,* 1 Adk. 411; Powell on Devises, 421; *Tucker* v. *Seaman's Aid Society,* 7 Metc. 205; *Brewster* v. *McCall's Devisees,* 15 Conn. 274; *Minot* v. *Boston Asylum,* 7 Metc. 416.

This is a charitable bequest. *Straw* v. *Trustees,* 67 Me. 493; *Maine Baptist Miss.* v. *Portland,* 65 Me. 92; *Howard* v. *Peace Society,* 49 id. 288; *Burr* v. *Smith,* 7 Vt. 241; *Fairbanks* v. *Phillips,* 14 Allen, 539; *Attorney General* v. *London,* 1 Ves. Jr. 243; *Attorney General* v. *Stepney,* 10 id. 22; *Society* v. *Attorney General,* 3 Russ. 142; *Wilkinson* v. *Lindgren,* (L. R.) 5 Ch. 570; 69 Me. 92; *West* v. *Shuttleworth,* 2 M. & K. 684; *Attorney General* v. *Hickman,* 2 Eq. Cas. Ab. 193; *Evangelical Association's Appeal,* 35 Pa. 316; *Earl* v. *Wood,* 8 Cush. 430; *Dexter* v. *Gardner,* 7 Allen, 243; Whitford on Charities, 18; 2 Perry on Trusts, 697, 701; Theobald on Construction of Wills, 181; Tudor on Charitable Trusts, 10; Boyle on Charities, 41, 51.

After-acquired property passes under a will. The will of Phebe L. Smith, by its terms, speaks as from her death, and was clearly intended to operate as from the date of her death. *Decker* v. *Decker,* 121 Ill. 341; *Fleming* v. *Burrows,* 1 Russ. 276; *Bland* v. *Lamb,* 5 Mad. 412; 2 J. & W. 399.

The estate should bear the costs of this litigation, including solicitors' fees to those engaged in seeking to carry out the designs of testatrix. *Straw* v. *Societies,* 67 Me. 495; *Dean* v. *Home for Aged Women,* 111 Mass. 132; *Sawyer* v. *Baldwin,* 20 Pick. 388; *Smith* v. *Smith,* 4 Paige, 271; *Webster* v. *Morris,* 66 Wis. 400; *Noe's Admr.* v. *Miller's Exrs.* 31 N. J. Eq. 238; *Noyes* v. *Children's Aid Society,* 3 Abb. New Cas. 36.

Messrs. Norton, Burley & Howell, for the executors and trustees, appellees:

If by any reasonable construction the will can be applied to the whole estate, that construction will be adopted. 1 Jarman on Wills, 851, note m; *Decker* v. *Decker,* 121 Ill. 341; *Given* v. *Hilton,* 95 U. S. 591; *Scofield* v. *Olcott,* 120 Ill. 363; *Higgins* v. *Dwen,* 100 id. 554; *Bland* v. *Lamb,* 5 Mad. 412.

Real estate acquired after the date of the will, may, in this State, be conveyed by the will. Rev. Stat. chap. 148, sec. 1; *Willis* v. *Watson,* 4 Scam. 64; *Peters* v. *Spillman,* 18 Ill. 370; *Decker* v. *Decker,* 121 id. 341; *Williams* v. *Johnson,* 112 id. 61.

If an ambiguity arises from matters *dehors* the will, it may be explained by extrinsic evidence. *Decker* v. *Decker,* 121 Ill. 341; *Patch* v. *White,* 117 U. S. 210.

In interpreting a will, the court may put itself in the position of the testator, and from that standpoint discuss the intention. *Blake* v. *Hawkins,* 98 U. S. 315; *Smith* v. *Bell,* 6 Pit. 68.

Where there is no person or object agreeing with that named in the will, an ambiguity arises, which may be explained by testimony outside of the will. *St. Luke's Home* v. *Association,* 52 N. Y. 191; *Holmes* v. *Mead,* id. 332; *Missionary Society's Appeal,* 30 Pa. St. 425; *Lefevre* v. *Lefevre,* 59 N. Y. 434; *Straw* v. *Societies,* 67 Me. 493; *Minot* v. *Boston Asylum,* 7 Metc. 416; *Howard* v. *Peace Society,* 49 Me. 288; *Hinckley* v. *Thatcher,* 139 Mass. 477; *Trustee* v. *Peaslee,* 15 N. H. 317; *Tilton* v. *Society,* 60 id. 377; *Brewster* v. *McCall's Devisees,*

15 Conn. 273 ; *Gord* v. *Needs,* 2 M. & W. 129 ; *Ayres* v. *Weed,* 16 Conn. 291 ; *Powell* v. *Biddle,* 2 Dall. 70 ; *Hawkins* v. *Garland's Admr.* 76 Va. 149 ; *Dowset* v. *Sweet,* Amb. Ch. 175, and list of cases in note 1, p. 175, (2d ed.) 1828.

. In making a bequest to a corporation, it is not necessary that it should be accurately named. · Any name is sufficient, if by it the corporation can be identified. *St. Luke's Home* v. *Association,* 52 N. Y. 191 ; *Holmes* v. *Mead,* id. 332 ; *Lefevre* v. *Lefevre,* 59 id. 434; *Missionary Society's Appeal,* 30 Pa. St. 425 ; *Straw* v. *Societies,* 67 Me. 493 ; *Minot* v. *Boston Asylum,* 7 Metc. 416 ; *Howard* v. *Peace Society,* 49 Me. 288 ; *Hinckley Thatcher,* 139 Mass. 477 ; *Taylor* v. *Tolen,* 38 N. J. Eq. 91 ; *First Parish of Sutton* v. *Cole,* 3 Pick. 232 ; *Tilton* v. *Society,* 60 N. H. 377 ; *Queen's College* v. *Sutton,* 12 Sim. Ch. 441 ; *Trustees* v. *Peaslee,* 15 N. H. 317 ; *Gilmer* v. *Stone,* 120 U. S. 586 ; *Institution for the Blind* v. *How's Exrs.* 10 N. Y. 84.

When such an ambiguity arises that the will has to be brought into chancery, the costs should be borne by the estate. *Smith* v. *Smith,* 4 Paige, 271 ; *Straw* v. *Societies,* 67 Me. 493 ; *Deane* v. *Horne,* 111 Mass. 132.

Messrs. BISBEE, AHRENS & DECKER, for the Chicago Foundlings' Home.

Messrs. HOYNE, FOLLANSBEE & O'CONNOR, for the Hahnemann Medical College :

Misnomer or misdescription of a legatee will not defeat the bequest, if from the will or extrinsic evidence the object of the bounty may be ascertained. *Lefevre* v. *Lefevre,* 59 N. Y. 434 ; *St. Luke's Home* v. *Association,* 52 id. 191 ; *Hospital* v. *Knight,* 11 Eng. L. and Eq. 191 ; *Minot* v. *Boston Asylum,* 7 Metc. 416 ; *First Parish* v. *Cole,* 5 Pick. 232 ; *Cromie's Heirs* v. *Orphan's Home,* 3 Bush, 365 ; *Banks* v. *Phelan,* 4 Barb. 80 ; *Straw* v. *Societies,* 67 Me. 493 ; *Nason* v. *First Bangor Church,* 66 id. 100 ; *Howard* v. *Peace Society,* 49 id. 288 ; *Congrega-*

*tional Society* v. *Hatch,* 48 N. H. 393; *Trustees* v. *Peaslee,* 15 id. 317; *Button* v. *Tract Society,* 23 Vt. 336; *Gilmer* v. *Stone,* 120 U. S. 586.

The bequest to the hospital was to the college, for the use of the hospital. *Hornbeck* v. *Bible Society,* 2 Sandf. Ch. 133; *Wright* v. *Trustees,* 1 Hoff. 202.

The presumption is, that the will disposes of the entire estate, unless rebutted. *Decker* v. *Decker,* 121 Ill. 341; *Higgins* v. *Dwen,* 100 id. 554; *Smith* v. *Smith,* 17 Gratt. 268; *Irwin* v. *Zane,* 15 W. Va. 646; *Goodright* v. *Marquis of Downshire,* 2 B. & P. 500; *Scofield* v. *Olcott,* 120 Ill. 362; *Cholmondely* v. *Weatherby,* 11 East, 322; *Freeman* v. *Duke of Chandos,* Cowp. 360.

If the endowment of the bed and the erection of the tablet should not exhaust the whole bequest to the college, the surplus would not go to the heirs, but either would belong to the college beneficially, subject to the charge of the endowment of the bed and the erection of the tablet, or would be applied to some charitable use on the doctrine of *cy pres.* 2 Redfield on Wills, 522, and cases cited; *Attorney General* v. *Wansay,* 15 Ves. 231; *Attorney General* v. *Coopers' Co.* 3 Beav. 29; *Attorney General* v. *Trinity College,* 24 id. 383; *Arnold* v. *Attorney General,* Show. P. C. 22; *Attorney General* v. *Mayor,* 2 J. & W. 294; *Mayor* v. *Attorney General,* 5 H. of L. 1; *Merchant Tailors' Co.* v. *Attorney General,* (L. R.) 6 Ch. App. 512; *Attorney General* v. *Dean of Windsor,* 8 H. of L. 369; *Attorney General* v. *College,* 2 C. & F. 295; *Jack* v. *Burnett,* 12 id. 812; *Attorney General* v. *Smythies,* 2 R. & M. 717; *Mayor* v. *Attorney General,* 6 H. of L. 310; *Attorney General* v. *Grocers' Co.* 6 Beav. 526; *Attorney General* v. *Cordwainers' Co.* 3 M. & K. 534; *Attorney General* v. *Tonna,* 4 Bro. C. C. 103.

Mr. LYMAN TRUMBULL, and Mr. CHARLES H. LAWRENCE, for the Illinois Training School for Nurses.

Messrs. WILLIAMS, HOLT & WHEELER, for the Presbyterian Board of Relief, etc.

Messrs. PEDRICK & DAWSON, for B. F. Smith, heir of Phebe L. Smith.

Mr. ROBERT A. CHILDS, for George O. Mead, executor, etc. :

The law requires that wills shall be in writing, and extrinsic evidence is never admissible to alter, detract from or add to the terms of a will.   *Kurtz* v. *Hibner,* 55 Ill. 519 ; *Updike* v. *Tompkins,* 100 id. 406 ; *Blanchard* v. *Maynard,* 103 id. 61 ; *Cowen* v. *Allen,* 113 id. 59.

The courts will not correct the mistake of a testator, however clearly a mistake.   *Kurtz* v. *Hibner,* 55 Ill. 519 ; *Starkweather* v. *Bible Society,* 72 id. 59 ; *Decker* v. *Decker,* 121 id. 341 ; *Patch* v. *White,* 117 U. S. 224 ; *Tucker* v. *Society,* 7 Mil. 188.

The heir is not to be disinherited without an express devise or necessary implication.   2 Jameson on Wills, rule 5, p. 841 ; 4 Kent's Com. (11th ed.) 535, note 4 ; *Van Kleeck* v. *Dutch Church,* 20 Wend. 457 ; *Hayden* v. *Stoughton,* 5 Pick. 536 ; *Howard* v. *Peace Society,* 49 Me. 288 ; *Ridgley* v. *Bond,* 18 Md. 433 ; *Wright* v. *Page,* 10 Wheat. 245 ; *Taubenhan* v. *Dunz,* 125 Ill. 524.

The heir being favored, is not to be disinherited through conjecture and uncertainty.   *Allen* v. *Allen,* 18 How. 391 ; *Clayton* v. *Clayton,* 3 Bin. 481 ; *Bradford* v. *Bradford,* 6 Whart. 244 ; *Bishop of Cloyne* v. *Young,* 2 Ves. Sr. 91 ; *Sayler* v. *Plaine,* 31 Md. 158 ; *Wright* v. *Hicks,* 12 Ga. 155 ; *Bender* v. *Dietrick,* 7 W. & S. 284 ; *Hitchcock* v. *Hitchcock,* 35 Pa. St. 393 ; *Downing* v. *Bain,* 24 Ga. 372.

Our statute giving power to devise after-acquired estate, was taken from Virginia, through Kentucky, and its construction in those States should control.   *Tyler* v. *Tyler,* 19 Ill. 155 ; *Rigg* v. *Wilton,* 13 id. 15.

In Virginia it is presumed the testator confines his bequest to land to which he is then entitled, and this presumed intention can only be overruled by words clearly showing a contrary intention. *Smith* v. *Eddington,* 8 Cranch, 66; *Raines* v. *Barker,* 13 Gratt. 128; *Gibson* v. *Carroll,* id. 136; *Allen* v. *Harrison,* 3 Call, 289; *Turpin* v. *Turpin,* 1 Washb. 75; *Kendall's Exrs.* v. *Kendall,* 5 Munf. 272.

The same rule prevails in Kentucky. *Warner's Exrs.* v. *Swearingen,* 6 Dana, 196; *Ross* v. *Ross,* 12 B. Mon. 437; *Flournoy* v. *Flournoy,* 1 Bush, 523.

The Illinois cases hold that it is wholly a matter of intention whether after-acquired real estate passes by will. *Willis* v. *Watson,* 4 Scam. 67; *Peters* v. *Spillman,* 18 Ill. 370; *Tyler* v. *Tyler,* 19 id. 151; *Williams* v. *Johnson,* 112 id. 61; *Decker* v. *Decker,* 121 id. 341.

The devisee in a will, whether a person or a corporation, must either be named by a correct and exact name, or must be so described as to be distinguished from all other persons or corporations. *Institution for the Blind* v. *How's Exrs.* 10 N. Y. 85; *Lefevre* v. *Lefevre,* 59 id. 440; *McAllister* v. *McAllister,* 46 Vt. 281; *Brewster* v. *McCall's Devisees,* 15 Conn. 289; *Preachers' Aid Society* v. *England,* 106 Ill. 125.

If named, the name must be either the correct one,—a name in common use, known to the testator,—or a name which the testator commonly applied to the particular person or corporation. *Lefevre* v. *Lefevre,* 59 N. Y. 440; *Banks* v. *Phelan,* 4 Barb. 90; *Hinckley* v. *Thatcher,* 139 Mass. 481; *Hiscocks* v. *Hiscocks,* 5 M. & W. 367.

If the words used to designate the devisee are words of description, they must convey an idea of particular qualities, attributes or functions, so distinct as to enable any one, without hesitation, to apply the words used to some particular person or corporation, as applicable to that person or corporation. *Institution for the Blind* v. *How's Exrs.* 10 N. Y. 85; *Lefevre* v. *Lefevre,* 59 id. 440; *St. Luke's Home* v. *Association,*

52 id. 194; *Brewster* v. *McCall's Devisees*, 15 Conn. 292; *Button* v. *Tract Society*, 23 Vt. 321; Powell on Devises, 338.

A lapsed residuary devise to one of the residuary devisees goes to the next of kin. 2 Redfield on Wills, 119; Starr & Curtis' Stat. chap. 30, par. 5; *Betts* v. *Betts*, 4 Abb. New Cas. 317; *White* v. *Howard*, 46 N. Y. 144; *Beekman* v. *Bonsor*, 23 id. 312; *Downing* v. *Marshall*, id. 373; *Van Kleeck* v. *Dutch Church*, 20 Wend. 457; *Creswell* v. *Cheslin*, 2 Eden, 123; *Ackroyd* v. *Smithson*, 1 Brown's Ch. 504; *Williams* v. *Neff*, 52 Pa. St. 326; *Brewster* v. *McCall's Devisees*, 15 Conn. 297; *Greene* v. *Dennis*, 6 id. 293; *Lingan* v. *Carroll*, 3 H. & M. 333; *Kirkland* v. *Cox*, 94 Ill. 400; *Skrymsher* v. *Northcote*, 1 Swanst. 570; *Everitt* v. *Everitt*, 29 N. Y. 72; *Cheney* v. *Teese*, 108 Ill. 479; Hawkins on Wills, 42, 43, 112.

Costs in a chancery suit are in the discretion of the court. Starr & Curtis' Stat. chap. 33, par. 18; *Blue* v. *Blue*, 38 Ill. 9; *Ennor* v. *Thompson*, 46 id. 214.

Solicitors' fees are not costs, under the statute. *Constant* v. *Matteson*, 22 Ill. 546; *Cooper* v. *McNeil*, 9 Ill. App. 97.

The costs of a suit brought for the construction of a will, including the necessary fees of counsel, are to be taxed and paid by the executors, and charged in their account as part of the expenses in the administration of the estate. *Monks* v. *Monks*, 7 Allen, 406; *Wilcox* v. *Wilcox*, 13 id. 252; *Amory* v. *Green*, id. 413; *Brooks* v. *Everett*, id. 457; *Sargent* v. *Sargent*, 103 Mass. 297; *Baker* v. *Clarke Institution*, 110 Mass. 88; *Bowditch* v. *Soltyk*, 99 id. 141; *Sawyer* v. *Baldwin*, 20 Pick. 378, and cases cited; 2 Daniell's Ch. Pr. (3d Am. ed.) 1503, 1506; *Rogers* v. *Ross*, 4 Johns. Ch. 608.

Costs and solicitors' fees are allowed in suits brought by executors for the construction of wills, to be paid as part of the expenses of administration, on the ground that such suits are rendered necessary by the want of care and precaution on the part of the testator. *Deane* v. *Home for Aged Women*, 111 Mass. 135; *Morse* v. *Stearns*, 131 id. 389; *Attorney Gen-*

*eral* v. *Moore's Exrs.* 4 C. E. Greene, 519 ; *Sawyer* v. *Baldwin,* 20 Pick. 388 ; *Straw* v. *Societies,* 67 Me. 493 ; *Webster* v. *Morris,* 66 Wis. 400.

Mr. JUSTICE WILKIN delivered the opinion of the Court:

It would be impossible to consider all the questions raised on this record, much less to notice all the points made in the various arguments filed, within the reasonable limit of an opinion.   Many of them, in the view we take of the case, are of no importance.   We shall give attention only to those which we regard as controlling questions in the case.   The first of these is, does the will of Miss Smith dispose of all of the property, real and personal, owned by her at the time of her death, or did she, as to a part of that property, die intestate.

By the death of Mrs. Turner after the execution of the will, testatrix inherited from her real estate amounting in value to about $17,000.   By the pre-decease of Mrs. Turner, the $15,000 legacy bequeathed to her lapsed.   Between the date of the execution of the will and the decease of Miss Smith certain shares of stock in the Chicago City Railway Company, owned by her, advanced in value about $30,000.   As to this after-acquired real estate, the lapsed legacy, and increased value of railway stock, the heirs contend Miss Smith died intestate, and on the theory that the condition named in the devise to the Hahnemann Hospital is a limitation upon the amount which it and each of the other residuary legatees can take, they insist that in no event could either of said six residuary devisees take more than $2500, and that whatever should remain after the payment of such sums must be treated as intestate estate, and descend to them, as heirs.

The rule for determining when after-acquired real estate passes by will, under our statute, is well enough defined by our own decisions, and therefore reference to those of other States is unnecessary.   In every case where that question

arises the intention of the testator must be sought after, and when ascertained will control. (*Willis et al.* v. *Watson et al.* 4 Scam. 64; *Peters et al.* v. *Spellman,* 18 Ill. 370; *Williams* v. *Johnson et al.* 112 id. 61.) If no intention to dispose of such estate appears from the will, it will not pass. But such intention is sufficiently shown by the language, "I bequeath all my property, real and personal, wheresoever the same may be, to my beloved wife, Hannah P. Peters," (*Peters et al.* v. *Spellman, supra,*) or, "I give and bequeath the care, profits and benefit of my whole estate, real and personal, so long as she remains my widow," etc. (*Willis et al.* v. *Watson, supra.* See, also, *Decker* v. *Decker et al.* 121 Ill. 358.) It was not intended by this last decision to change or modify the rule announced in the former decisions which are there cited with approval.

That Phebe L. Smith intended to dispose of all the property owned by her at the time of her death, by this will, is most clearly shown by its various provisions. In every clause of that instrument in which a manifestation of her intention in that regard would be sought for, there is a studied purpose to leave nothing undisposed of. In no single instance does she speak of property as it then existed, but always with reference to its condition at the time of her death. By the fifteenth clause she expressly says: "I give, devise and bequeath *all the rest, residue and remainder of my estate, both real and personal, to my executors.*" By the sixteenth clause she gives her executors power to manage her estate, to sell all or any part of it, and "*to demise and let all and any portion or portions of the realty belonging to my estate,* to improve all or any part of my estate," intending, as she expressly says, "to confer upon my executors all such powers as may be needful for the *full and convenient execution of my will and for the easy management of my estate.*" This is not the language of a scrivener or an attorney employed to draft her will, but written with her own hand. The presumption is that she intended her will to be a final disposition of her entire estate. (*Higgins* v. *Dwen,* 100

Ill. 554; *Taubenhan et al.* v. *Dunz*, 125 id. 530.)    This rule, says Redfield, "is founded upon the presumption that every man who sits down deliberately to make his will does not intend to leave any portion of his property in such a condition as not to pass by the will.    The idea of any one deliberately purposing to die testate as to a portion of his estate, and intestate as to another portion, is so unusual in the history of testamentary disposition as to justify almost any construction to escape from it."    (2 Redfield on Wills, 235.)    To the same effect is 2 Jarman on Wills, and *Higgins* v. *Dwen*, 100 Ill. 554. But here there is no occasion to indulge in or resort to presumption.    The intention is expressed in unmistakable language.

But it is insisted, that notwithstanding the manifestation of such intention by the will itself, the fact that the after-acquired real estate came to testatrix from her deceased sister, Mrs. Turner, by inheritance, who, by the said fifteenth clause, is given the income of all the residue of the estate during her life, disproves such intention.    The argument in support of this theory is based on the proposition that before Miss Smith could have intended to dispose of such real estate by will, she must have foreseen the death of her sister, and known that she would inherit it from her, "and then deliberately express her last wish, in writing, that Mrs. Turner, though dead, should enjoy the income of this real estate for life."    This, it is said, would be absurd, and no one, we presume, will question the correctness of the conclusion, if the premise is correct.    The fallacy of the proposition lies in the assumption that after-acquired real estate can only be disposed of by will when the testator has manifested an intention to that effect as to the particular real estate in question,—that to pass after-acquired real estate by will, the will must be made in anticipation of obtaining such real estate.    The question is not, what did testatrix intend as to real estate which she might inherit from her sister, or purchase from a stranger, or obtain by will, but

what did she intend as to her *entire* estate at death, from whatever source obtained. If it appears from the will that she intended all to pass by the will, then after-acquired real estate is conveyed. It might with equal propriety be said that it is absurd to suppose a person ever intends to dispose of property by will which he neither owns nor expects to own; and yet the manifestation of such an intention is perfectly rational, as expressive of a desire that no part of the estate shall be left intestate. It is clear enough that Miss Smith did not, at the time she made her will, have a specific intention to dispose of property which she might thereafter inherit from her sister, because it was impossible at that time for her to know that she would obtain property in that way; but she manifestly did intend that "all the rest, residue and remainder" of her estate, "both real and personal," owned by her at the time of her death, no matter how or from what source obtained, should pass to her executors, because she so expressly says, and that is all that is necessary, under our statute, to pass after-acquired real estate.

The case of *Harrison et al.* v. *Allen*, 3 Call, 289, cited by counsel as sustaining their contention, is clearly distinguishable from this case, and even if we were disposed to accept its reasoning as correct, it could have no controlling influence here. There the will gave all the estate of the testator to his two sons. One of the sons died before the father, leaving certain real estate, which the father inherited. It was said in that case, the testator could not have intended to devise to his son lands which he was to acquire from him by descent. The case here is very different. Miss Smith had two purposes in her mind when she drew the fifteenth clause of her will. One was, to provide a legacy for her sister during her life; and the other, to preserve the principal of her residuary estate to be finally disposed of for the benevolent purposes named. There is no authority in this record for the statement of counsel that "the chief object of this provision was to furnish an income to

Mrs. Turner for life." Mrs. Turner did not need such provision. The bequest to her for life was rather an exhibition of sisterly affection than a desire to provide for her. At least, there is no reason for saying that the final disposition of her property by the fifteenth clause was not quite as controlling in the mind of testatrix as the bequest of its income. We entertain no doubt that, under the law of this State, all after-acquired real estate of testatrix passed to and became vested in her executors under the provisions of her will.

There is still less ground for the contention that all of the personal estate did not so pass. It is not denied that the general rule is that all personalty owned by the testatrix at the time of her death would pass under the residuary clause of this will. It is contended, however, that the intention of testatrix being clearly shown to the contrary, the lapsed legacy and increased value of railway stock will not pass. No such intention is shown. On the contrary, we think, for reasons already stated, the intention was in exact accord with the general rule of law. There is no sufficient reason for saying that the fourteenth clause does not apply to the lapsed legacy. As well might it be said that the railway stock itself did not pass, as that its increased value does not.

Nor do we think the condition upon which the devise to the Hahnemann Hospital is made in any way tends to show that testatrix intended to leave a part of her estate intestate. To say that when she wrote that condition she had in her mind a particular amount of money which the hospital should receive, and that that sum should be a limit to the amount which all other residuary devisees should receive, scarcely seems reasonable, in the light of the preceding language,—"and after my death to divide such *residuary estate equally between the following corporations, associations and societies.*" There is no evidence in this record from which it can be determined what it would cost to endow a bed in that hospital. There is perhaps evidence from which one may conjecture as to the cost;

but when counsel say $2500 would be sufficient to endow the bed and erect the mural brass tablet, they might, with equal plausibility, have said $1500 or $3000, for there is not a particle of proof as to the actual, or even probable, cost of the tablet. There is no proof whatever that Miss Smith had the slightest information as to the cost of endowing a bed or erecting a tablet in said hospital. We can not, therefore, say that she had in mind when she wrote the condition to this legacy, a sum other than that expressly named,—one-sixth of her residuary estate.

The conclusion is irresistible, from an impartial examination of this will, in the light of all the attendant and surrounding circumstances, that testatrix intended to dispose of all the property of which she might die seized, and we think it must be conceded that if Benjamin F. Smith and George O. Mead take from her estate by inheritance, they must do so, not because she intended they should, but because she has so far failed to name or describe those to whom she desired to give the residuum of her estate, that effect can not be given to her desire in that regard.

It will therefore become necessary to next determine whether or not the claimants, "The Illinois Training School for Nurses," "The Presbyterian Board of Relief for Disabled Ministers and the Widows and Orphans of Deceased Ministers," "The Board of Trustees of the Hahnemann Medical College," and "The Woman's Union Missionary Society of America for Heathen Lands," have, by competent evidence, shown that they were intended by the names and descriptions, "The Chicago Training School for Nurses," "The Fund for Disabled Ministers of the Presbyterian Church," "The Hahnemann Hospital at Chicago, Illinois," and "The Woman's Union Mission (of Chicago)."

It is well settled by all the authorities, that a mistake in the name or description of a legatee or devisee, whether an individual or corporation, will never render a bequest void if

the name and description used in the will, as applied to the facts and circumstances proved, will identify such person or corporation from all others.    It is equally well settled, that whenever parol evidence becomes necessary to remove such uncertainty, "a court may inquire into every material fact relating to the person who claims under a will, to the property claimed as the subject of disposition, to the circumstances of the testator and his family and affairs, for the purpose of enabling the court to identify the person intended by the testator."    (Fifth Proposition applicable to the exposition of wills, by Wigram on Wills, p. 56.)    The law is not, says this author, so unreasonable as to deny to the reader of all instruments the same light which the writer enjoyed.    (Ibid. 161.) In citing cases illustrating his Fifth Proposition, above quoted from, he says "they might be multiplied without end," and adds, "they appear to justify the conclusion that every claimant under a will has a right to require that a court of construction, in the execution of its office, shall, by means of extrinsic evidence, place itself in the situation of the testator the meaning of whose language it is called upon to declare."

Under this rule, it was unquestionably competent for these various claimants to prove their corporate existence, and the objects and purposes for which they were organized; the knowledge, if any, which testatrix had of them, and her feelings toward and relations with them; the name or names by which she or others were accustomed to designate them; that no other corporations, associations or societies corresponding to the name or description given in the will existed at the time it was executed; her family, church and social relations,—in short, every fact and circumstance surrounding her and these claimants, which would aid the court in reaching a conclusion as to her motives and purposes in using the names or descriptions in question.    If such evidence makes it clear that these claimants were intended by testatrix to be made the objects of her bounty, then it must be held that she has expressed her

intention with sufficient certainty. There is no other criterion of legal certainty in the interpretation of wills.

The undisputed evidence in this record applicable to the several corporations claiming under this will, the competency of which, under the foregoing rule, can not be challenged, shows:

*First*—As to the Illinois Training School for Nurses, that it is a corporation duly organized under the laws of this State, September 15, 1880, its object being to train nurses for the sick and wounded; that since its organization it has maintained such a school in the city of Chicago. Also, that this corporation was frequently called by the name "The Chicago Training School for Nurses." As early as 1881 testatrix contributed $100 to it, and frequently manifested her interest in its success. At the execution of this will there was no other school for nurses in Illinois.

*Second*—As to the Presbyterian Board of Relief for Disabled Ministers and the Widows and Orphans of Deceased Ministers, that it was organized as a corporation under the laws of Pennsylvania, in 1876, its purpose being to hold real and personal estate given for the relief of disabled ministers and the widows and orphans of deceased ministers of the Presbyterian church. Testatrix became a member of the Presbyterian church in the city of Chicago many years prior to the execution of her will, being in the later years of her life a member of the Fourth Presbyterian Church of that city. From 1874 she more frequently attended Prof. Swing's church, but continued her membership in the Fourth church, attending its services more or less frequently until a short time prior to her death. She disposed of her pew in that church by this will. Prior to 1870 there existed two branches of the Presbyterian church, known as the old school and the new school. Each of these had established a fund for their disabled ministers and the widows and orphans of deceased ministers, which was administered by committees appointed by the general assembly of the Presbyterian church. In 1870 these two schools formed a union, and thereafter

became "The Presbyterian Church in the United States of America," and this is commonly understood to be meant, especially in the Northern States, by the name Presbyterian church. After this union the said fund continued to be raised by annual contributions, and collections were frequently taken up in the said Fourth Presbyterian Church in Chicago for the benefit of that fund. After the organization by the claimant corporation, this fund ceased to be controlled by committees, and passed into the hands of the claimant corporation, where it has ever since been administered, and it is shown to be the only corporation, association or society of "the Presbyterian church, for the relief of disabled ministers." It is also clearly established by the testimony that testatrix knew of this fund, its object and purposes, and looked upon it with approval.

*Third*—As to the Board of Trustees of the Hahnemann Medical College, that it was organized as a corporation under special charter granted by the legislature of this State, February 14, 1855, its object being, among other things, to teach the theory and practice of homeopathic medicine. It was authorized by its charter to add dispensary and hospital departments. In 1870, J. Y. Scammon founded a hospital in the city of Chicago, of which the faculty of this medical college took charge in 1871. In 1872 Mr. Scammon donated the hospital property to claimant, and at his request the name was changed from "Scammon Hospital" to "Hahnemann Hospital." The college building fronts on Cottage Grove avenue, in the city of Chicago, and the hospital buildings and grounds are directly in the rear of it, on the opposite side of the avenue. At a meeting of the board of trustees of the college, in May, 1873, this hospital was formally turned over by its managers to and accepted by claimant, and it has ever since been known as the "Hahnemann Hospital." No other hospital in Chicago bears the name of "Hahnemann Hospital" or "Hahnemann Hospital at Chicago, Illinois," nor is there any corporation, association or society in the city of Chicago with which the word "Hahne-

mann" is connected.    Testatrix was a strong believer in this school of medicine.    She frequently visited this institution, carrying flowers to its patients.    She was an intimate friend and related by marriage with one of the trustees of claimant, and constantly visited his family.    There can be no question that she knew that this hospital was a part of and under the control of the claimant corporation.

*Fourth*—As to the claim of the Woman's Union Missionary Society, it is shown that this corporation was duly organized under the laws of the State of New York, February 1, 1861, its home office being located in the city of New York.    About 1866 testatrix and other ladies in Chicago each pledged themselves to raise the sum of $20 per year to be sent to this society for missionary purposes, and she continued to send it that sum every year until in 1870, when, with lady friends in Chicago, a branch society was organized, and named "The Chicago Branch of the Woman's Union Missionary Society of America for Heathen Lands," and testatrix became a member of its board of management, and continued to act in that capacity until she died.    Each year she sent through this branch, to the parent society in New York, money and various articles to be used by it in its missionary work.    She also sent directly to said parent society, boxes containing articles to be sent forward to heathen lands, with money to pay the expense of shipment.    She was a regular attendant upon the meetings of the branch society, and always visited the rooms of the home office when in the city of New York, which was generally once each year.    The corporation was seldom, if ever, spoken of by its full corporate name.    In Chicago it was usually called "The Woman's Union Missionary Society."    Members of the branch society, in conversation, frequently called it by other names, but it was known in its business meetings and among all its members as "The Woman's Union Missionary Society."    In New York, Miss S. D. Doremus, corresponding secretary of the corporation, swears:    "The society is usually designated as

'The Woman's Union Mission;' it is often called 'The Union Mission.'" She also says, Miss Smith always spoke of the society as "The Woman's Union Mission." "It is the name almost every one called it." Miss Emily O. Wheeler, residing in New York City, testified: "I knew Phebe L. Smith all her life. Our relations were almost as sisters. She lived in our family for years." Miss Wheeler was present at the making of the will in question, and one of the witnesses thereto. She says Miss Smith called the society with which Mrs. Avery was connected, "The Woman's Union Mission of Chicago." She also says she knows of Miss Smith sending contributions to Mrs. Avery, of Chicago, for missionary work. "She sent the contributions, as I understood her, to Mrs. Avery for work among the heathens. It was for the 'Woman's Union Mission of Chicago,' as she called it." She further testified that Miss Smith frequently contributed articles of personal property to the society here in New York, for the heathen, the society of Mrs. Doremus. She made picture books and fancy articles for, and was constantly sending them to, the society. "In conversation with me, she connected Mrs. Avery with the Chicago society, and Miss Doremus with the New York society." Dora B. Robinson says: "In speaking of this society, I think seventy-five per cent of persons use an abbreviated name. * * * I never speak of it in any other way than 'The Woman's Union Missionary Society,' or "The Woman's Union Mission.'" On cross-examination she says: "I said seventy-five per cent of the people connected with our society, and with whom I came in contact, spoke of it as 'The Woman's Union Mission.' I base my statement simply because the name was too long. Miss Doremus used to speak of it in that way, and she gave it its title." Miss Smith had been in New York three or four months prior to making her will. Miss Doremus testifies that she generally came to New York once a year. "I have talked with her often about our society matters. She

called constantly at our mission rooms, 411 Bible House, and at my house."

No attempt was made to contradict or impeach any of this evidence by other witnesses. It is contended, however, that by cross-examination that part of the evidence of the witnesses which tends to prove that the corporation was called in New York "The Woman's Union Mission," is completely overcome and destroyed. We do not think so. Throughout the entire case the heirs-at-law have not attempted to show that Miss Smith did not mean these claimants, or that she was so connected or associated with other corporations, associations or societies as that she might have intended them, but they have sought only to defeat these four bequests by contending that the will itself, and competent extrinsic evidence, leave it wholly uncertain as to what societies were intended.

An almost infinite number of cases involving the validity of bequests where the legatee or devisee was inaccurately named or described in the will, can be found. They have generally arisen out of conflicting claims to the same bequest by two or more individuals or corporations; but we also find many cases in which, as here, there is but one claimant. These cases can not be wholly reconciled, so as to obtain from them a general rule by which it can be determined just when such bequests are to be sustained. Each case must be determined upon its own peculiar facts,—the object in every case being, if possible, consistent with the rules of evidence, to ascertain and give effect to the intention of the testator; and an examination of the authorities will clearly show that the tendency of all the decisions is in the direction of liberality in permitting the introduction of extrinsic evidence for that purpose. Vice-Chancellor Wigram, in his work on this branch of the law of wills, says: "Latterly, very few wills are held to be wholly void for uncertainty."

In *Tucker et al.* v. *Seaman's Aid Society et al.* 7 Metc. 188, Chief Justice Shaw says: "The principle established by the

cases is, that the estate must pass by the will.  *  *  *  Where the name or description used in the will does not designate with precision any person, but where, when the ·circumstances come to be proved, so many of them concur to indicate that a particular person was intended, and no ·similar conclusive circumstances appear to distinguish and identify any other person, the person thus shown to be intended will take." He again says, in *Minot et al.* v. *Boston Asylum, etc.* 7 Metc. 416 : "Where the name and description in a legacy, when applied to the facts, lead to a reasonable belief that they apply to some one person, and there is no other person to whom they can with any probability apply, then much slighter evidence will be sufficient to prove that that person was intended by the designation." So in the case of *Thomas* v. *Stevens et al. Exrs.* 4 Johns. Ch. 607, although the bequest was to Cornelia Thompson, it was given to Caroline Thomas, a person of entirely different name, no person by the first name appearing to claim it, although the evidence of intention was but slight, consisting chiefly in proof of the fact that the claimant was a favorite with testatrix.

In *Gilmore* v. *Stone*, 120 U. S. 586, the language of the bequest was, "to be equally divided between the board of foreign and the board of home missions." The claim was by the "Board of Foreign Missions of the Presbyterian Church in the United States of America" and the "Board of Home Missions of the Presbyterian Church in the United States of America." Both corporations were created under the laws of New York. Testator was a resident of Menard county, this State. An attempt was made by his heirs to defeat the bequest. It was agreed in the case that other religious denominations, like the Presbyterian, had boards of home and foreign missions in the United States of America, and therefore it was contended that the bequest was void for uncertainty. It was shown by extrinsic evidence that the testator was a member and elder in the Presbyterian Church of the United States of America ; that

collections were annually taken up in the congregation to which he belonged, for the various boards of that church, including the boards of foreign and home missions; that while it was announced from the pulpit that collections were taken for the "board of foreign missions" or the "board of home missions," without in words naming the Presbyterian church, all such collections, with the knowledge and the assent of the church session, of which testator was an active and zealous member, were, without exception, sent to the officers of the "Presbyterian Boards of Foreign and Home Missions in New York City," and regular reports thereof made to the session; that the testator took especial interest in the work of those boards, and uniformly contributed thereto, and that he did not, so far as his pastor or associates in the church session knew, make contributions to the societies of any other church, except the "Bible Society," which was sustained by several religious organizations. After holding this evidence competent, the court, by HARLAN, Judge, proceeds to say: "Construing, then, the will with reference to the extrinsic evidence of the uniform relations of the testator to the subject of foreign and home missions, and to certain societies engaged in that kind of work, it is not to be doubted that in the eleventh clause he held in mind the 'Boards of Foreign and Home Missions' of the general religious society or organization of which he was a member and officer. The words of the will very well apply to such an object, and therefore, in so interpreting its provisions, no violence is done to the language employed by the testator."

In *Preachers' Aid Society* v. *England,* 106 Ill. 125, the Preachers' Aid Society of the Illinois *Annual* Conference of the Methodist Episcopal Church claimed title under a deed to the "Preachers' Aid Society of the Illinois Conference of the Methodist Episcopal Church." We there said: "We are of the opinion that the deed of Phillips bearing date September 14, 1874, vested the legal title to the property in controversy in the

24—131 ILL.

plaintiff in error. It is said in 2 Washburn on Real Property, (2d ed.) 588: 'The object of names being merely to distinguish one person from another, it seems to be sufficient if this is effected, though the true name of the party be not used, or even no name at all. The general principle of law is, *id certum est quod certum reddi potest,* and a man may be described by his office or his relationship to a known person;' and hence it would undoubtedly have been sufficient, here, if the conveyance had been to 'the corporation lately created for the purpose of aiding superannuated preachers of the Illinois conference of the Methodist Episcopal church, and widows and orphans of such preachers,' for this would be an accurate description of plaintiff in error, no other corporation for that purpose being shown to have been lately created. But the deed under consideration is to 'The Preachers' Aid Society of the Illinois Conference of the Methodist Episcopal Church.' Had it been shown that a corporation of that name existed, we would, of course, be bound to assume the conveyance was to such corporation; but no such corporation being shown to be in existence, inasmuch as we must, from the language of the deed, infer it was intended to convey to some society or corporation, we are driven to the conclusion that these words were used to describe, rather than to express the accurate and full name, of the grantee; and, regarding them in this light, they clearly designate the plaintiff in error as the grantee."

In *Tilton, Exr.* v. *American Bible Society,* 60 N. H. 377, the bequests were to the "Bible Society," "Foreign Mission Society," the "Home Mission Society" and the "Tract Society." The respective legacies were claimed by the New Hampshire Bible Society, the American Board of Commissioners for Foreign Missions, the New Hampshire Home *Missionary Society,* and the American Tract Society, (a New York corporation,) and these latter societies were held to be the legatees intended.

In *Wood* v. *White,* 32 Me. 340, the devise was to F. Wood, and George Wood secured the legacy. It appears that there

were two persons in the town named James and Joseph Wood, but the testator did not appear to have ever had any business relations with either.

In *Hinckley* v. *Thatcher*, 139 Mass. 477, the residuary devise was "equally to the authorized agents of the home and foreign missionaries, to aid in propagating the holy religion of Jesus Christ." Various societies laid claim to the legacy, and the court decreed in favor of the American Board of Commissioners for Foreign Missions and the Massachusetts Home Missionary Society, "upon extrinsic evidence of facts known to the testator at the time he executed the will, the names he was accustomed to call the missionary societies, or by which they were usually called and known in the religious society with which he worshiped, the interest shown by him in any particular missionary society, and the contributions which he made for missionary purposes."

In *Domestic and Foreign Missionary Society's Appeal*, 30 Pa. St. 425, a devise to "the missions and schools of the Episcopal church about to be established at or near Port Cresson," was declared to be a good charitable bequest to the Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America, a New York corporation. See, also, *Le Fevre* v. *Le Fevre et al.* 59 N. Y. 440; *Button, Exr.* v. *American Tract Society et al.* 23 Vt. 336; *McAllister* v. *McAllister*, 46 id. 272; *Newell's Appeal*, 24 Pa. St. 197; *Brewster* v. *McCall's Devisees*, 15 Conn. 274; *Goodell* v. *Union Association*, 2 Stewart's Eq. 32.

We have not cited these cases as being more particularly in point than many other cases referred to by counsel representing these various claimants, in their several briefs, nor do we wish to be understood as saying that they are not distinguishable from the case made by the several claimants in this case; but in principle they sustain the bequests involved in this inquiry, and the claims of the various claimants thereto.

The names and descriptions used in the fifteenth clause of this will, with the language preceding them, clearly show a purpose on the part of testatrix to give one-sixth of the residuum of her estate to a corporation, association or society maintaining a training school for nurses in Chicago, another sixth to a corporation, association or society maintaining a Hahnemann hospital at Chicago, Illinois, and another sixth to a corporation, association or society having charge of a fund for disabled ministers of the Presbyterian church. The evidence establishes, beyond question, that three of these claimants are corporations, and were when this will was written, one carrying on a training school for nurses in the city of Chicago, another having and maintaining a Hahnemann hospital in said city, and the third having charge and control of a fund for the benefit of disabled ministers of the Presbyterian church. It also proves, beyond controversy, that at the time Miss Smith wrote her will there was no other corporation, association or society maintaining such a school or hospital in Chicago, or having such a fund. The conclusion is therefore inevitable that she intended these claimants. When, however, to this is added the clear and convincing proof that the particular school, hospital and fund in charge of these claimants were the objects of her favor and sympathy, it becomes as morally certain that she intended that they should become the objects of her bounty as though she had succeeded in naming them with absolute accuracy.

The claim of the Woman's Union Missionary Society is to our minds no less clearly established. It is true, the language used in the will is not so explicit, but the extrinsic proof showing the peculiar relationship of testatrix to this corporation is much clearer. To say that we may read so much of the extrinsic evidence offered by this claimant as tends to place us in the position of Miss Smith when she wrote her will, and still insist that we can not ascertain her intention to be to give a part of her estate to claimant, would be unreasonable.

The words, "Woman's Union Mission," as here used, are equivalent to "Woman's Union Missionary Society." Taking all the language of the will applicable to the bequest in question, and giving to the word "mission" its commonly accepted meaning, it would read substantially as follows: To a corporation, association or society known as the Woman's Union Missionary Society (of Chicago), one-sixth of the remainder of my estate. Clearly she intended to give, by this bequest, to a missionary society under the management of a woman's union; and this corporation being the only society of that kind in this country, at least known to testatrix, and it being so fully shown that it was the peculiar object of her bounty and affection for years, and up to the very time of her death, we see no escape from the conviction that she meant the New York corporation claimant, and that by the words "of Chicago," in parenthesis, she only indicated her desire that this, as other gifts made by her to it, should be through the Chicago branch.

We think this claim may also be sustained upon the ground that the name used in the will was one by which testatrix, and others connected with the claimant corporation, were accustomed to call it. Giving to the word "mission" the meaning "missionary society," the evidence clearly shows that in Chicago it was so called. In New York, where the will was written, and where testatrix had been living for several months immediately prior thereto, it was often called "The Woman's Union Mission." In reaching this conclusion, we have not overlooked the cross-examination of witnesses who so testify. The master's report should have been sustained as to this as well as the other claimants.

The claim of the Illinois Training School for Nurses is also maintainable on the ground that the name used in the will—"Chicago Training School for Nurses"—was, at the time of the execution of the will, a name commonly applied to claimant.

In the case of the Hahnemann Medical College, under the proofs, the bequest was to the college, for the use of the hos-

pital. (*Hornbeck, Exr.* v. *American Bible Society*, 2 Sandf. Ch. 133; *Wright et al.* v. *Trustees of M. E. Church*, 1 Hoff. Ch. 202.) "A bequest to the Old Ladies' Home, at present near Pincon Hill, near St. Mary's Hospital, when the proof showed no such organization, but that such an institution was a department of and under the control of a corporation known as the Sisters of Mercy, and was situated near the place indicated in the will, was held to entitle the Sisters of Mercy to the amount bequeathed for such purpose." *Gibson's Estate*, 75 Cal. 329.

From a consideration of all the evidence in this case, we are clearly of opinion that testatrix intended to give one-sixth of her residuary estate to each of these claimants, and that to give effect to that intention is violative of no rule of law, and certainly of no rule of right. It therefore follows, that the "Chicago Foundlings' Home," "The Home for Incurables at Chicago," "The Illinois Training School for Nurses," "The Presbyterian Board of Relief for Disabled Ministers and the Widows and Orphans of Deceased Ministers," "The Board of Trustees of the Hahnemann Medical College of Chicago," and "The Woman's Union Missionary Society of America for Heathen Lands," through its Chicago branch, are entitled to the residuum of the estate of testatrix, whatever it may be.

As to the share of the Hahnemann Medical College, it must, of course, be applied to the use of the hospital department of that institution, according to the conditions of the will. It remains, however, to be determined, whether or not the court below decided correctly in decreeing that if the amount received by it should exceed the necessary cost of endowing a bed and erecting the tablet mentioned in the condition, the balance should be expended in the endowment of other beds. This part of the decree below is, of course, based upon the doctrine of *cy pres.* It is contended by the heirs, that the decree in this respect is unauthorized, upon the ground that no question of that kind was in issue before the court. Upon

a careful examination of the pleadings, we think the point is well made. As we have before said, there is no proof in this record as to what will be the reasonable cost of endowing a bed or erecting the tablet, and while we are clearly of opinion that any surplus which may remain after this condition in the bequest is complied with, must be used for the benefit of the hospital department of the medical college, we think the question as to how that surplus shall be used should be left until the amount thereof can be ascertained, or at least until the claimant shall have been heard upon that question. This matter, however, can be properly adjusted upon the remanding of the cause.

We find no error in the ruling of the court below in the matter of costs and attorneys' fees. In *Smith* v. *Smith*, 4 Paige Ch. 271, it is said: "As a general rule, if the testator has expressed his intention so ambiguously as to create a difficulty, which makes it necessary to come into the court of chancery to give a construction to the will or to remove the difficulty, the costs of the litigation must be borne by the estate, and the general residue is the primary fund for the payment of such costs." 3 Brown's C. C. 27; 6 Ves. 349; 1 Sch. & Lef. 12; 3 Peere Wms. 303; *Straw* v. *Societies*, 67 Me. 493.

As to the amounts allowed by the court to the respective parties, they are so far in the discretion of the chancellor, that in the absence of proof of the abuse of that discretion we can not interfere, nor in this case are inclined to do so, more particularly in view of the fact that no more has been done by the decree of the court below than to fix the amount which the estate should pay to each of the parties, leaving the reasonableness of solicitors' fees open to adjustment between the various solicitors and their clients.

The decree of the circuit court will be reversed, and the cause remanded, with directions to proceed in accordance with the views here expressed.

*Decree reversed.*