## Burton A. Hitchcock, Executor, Appellee, v. Board of Home Missions of the Presbyterian Church, etc., et al., Appellees. Jefferson J. Greene and Langford R. Green, Appellants.

## Gen. No. 5,626.

1. CHARITIES—*statute of uses.* The statute of charitable uses is in force in this state.

2. CHARITIES—*when gift does not fail.* Under the statute of charitable uses, a gift to charity does not fail for want of a definitely named person or corporation to execute the gift.

3. CHARITIES—*extrinsic evidence as to donee.* Whenever there is a mistake or uncertainty as to the name of the person or body intended to take a charity, extrinsic evidence may be introduced to show who was intended.

4. CHARITIES—*designation of donee.* Where a gift was made by will to "Home Missions and Foreign Missions," the court properly held that the Board of Home Missions of the Presbyterian Church and the like Board of Foreign Missions took under the will where the evidence, although somewhat contradictory, tended to show that the donor was a member and a supporter of the Presbyterian Church, that she was actively engaged in Presbyterian Church Missions, and largely supported such Home and Foreign Missions.

5. CHARITIES—*designation of donee.* Where a gift is made by will "for the education of poor children," a finding by the court, that it was intended for the children of the Troy Asylum, is supported by evidence which tends to show that the donor on her long visits to said asylum manifested great interest in the education of the children therein, that some of her relatives were officers of the institution, that she had planned to erect a building for the smaller children at the asylum (this, however, was subsequent to the date of the will), and there is practically no evidence as to her interest in other poor children.

6. CHARITIES—*directions to trustees.* Where the court appoints a person as trustee of a charity fund created by will, the decree should define and determine the powers and duties of such trustee, and in what way, in what vicinity, and to what extent per year said fund should be expended, where no directions whatever are given by the donor.

7. WILLS—*construction.* When "between" is used with reference to a gift to three or more parties, it has the meaning of "among."

8. WILLS—*construction*. A gift "to be equally divided between Home Missions, and Foreign Missions, and for education of poor children," should be divided in three equal parts for the three bodies mentioned.

9. WILLS—*residuary clause*. Where a clause in a will disposes of certain articles of personal property, and concludes by giving "the rest of my things, beds, bedding, silver, furniture, whatever it may be," etc., such clause does not embrace all the personal estate, but only articles similar to those disposed of by such clause where there is a prior residuary clause, and a decree construing the will should be so limited.

10. WILLS—*costs of bill to construe*. Where a will is so ambiguous that it is necessary to apply to a court of equity for its construction, the cost of the litigation, including solicitor's fees, must be borne by the estate, and the general residue is the primary fund for their payment.

Bill to construe will. Appeal from the Circuit Court of Peoria county; the Hon. N. E. WORTHINGTON, Judge, presiding. Heard in this court at the October term, 1911. Affirmed in part, reversed in part and remanded with directions. Opinion filed October 15, 1912.

JUDSON STARR & WINSLOW EVANS, for appellants.

FRANK T. MILLER, for appellee.

JACK, IRWIN, JACK & MILES, for Board of Home & Foreign Missions.

JOHN S. STEVENS and WILLIAM H. STEAD, Attorney-General, for Charity for Poor Children.

LUTHER C. HINCKLE, for Troy Orphan Asylum.

CHARLES C. DUTCH, Guardian *ad litem* for Edna Greene, et al.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

Mrs. Phebe Rose, a resident of Dunlap, in Peoria county, died a widow and without descendants, leaving a will which was admitted to probate. The will was in her own handwriting. She had apparently copied it, evidently with changes, from a previous will

drawn by some other person. Her executor filed a bill and an amended and supplemental bill, hereinafter called the bill, to construe the 22nd and 23rd clauses thereof, which were as follows:

"Twenty second. It is my will after what I have named be satisfied what left be equally divided between Home Missions and Foreign Missions and for education of poor children.

"Twenty third. I will divese and bequeath to my Brother Jefferson J. Greene children first Abigal Clark my hair wreath and Bracelets second Hettie Stine my best diamond ring third Sarah May Seelye my other diamond ring. I think equally as much of you but if you survive your Parent you are well provided for is my reasons for so doing. The rest of my juelry to be devide among the rest of the nieces the best it can be with the exception of my watch and chain my will that Wyatt Greene have that The rest of my things, beds beding silver furniture whatever it may be devided amongst all the nieces the best it can be."

All parties in interest were either original defendants or intervened and became defendants and most of them answered. The Board of Home Missions of the Presbyterian Church in the United States of America and the like Board of Foreign Missions each claimed one-third of the residue under said 22nd clause. Certain missionary societies of the Methodist Episcopal Church made claims to share in this fund. The Troy Orphan Asylum, at Troy, New York, claimed the portion given for the education of poor children. The Attorney-General claimed that the gift for the education of poor children was definite and should be administered by a trustee. The heirs at law claimed that the 22nd clause was invalid and that the residue was intestate estate and passed to them. Certain nieces claimed that the 22nd clause was invalid, and that, to prevent intestacy, the 23rd clause should be construed to give them the residue. The cause went to the master, who took and reported the evi-

dence and his conclusion that the clause in question should be construed to give one-third of the residue to that body known as the Board of Home Missions of the Presbyterian Church in the United States of America, one-third to the Board of Foreign Missions of the Presbyterian Church in the United States of America, and one-third to be used for the education of poor children under a trustee to be appointed and supervised by the court. The court overruled all exceptions by the heirs at law and nieces and most other exceptions, but by its decree directed one-fourth of the residue to be paid to said Presbyterian Board of Home Missions, one-fourth to the Presbyterian Board of Foreign Missions, and one-half to a trustee to be appointed by the court and to be devoted to the education of poor children under the supervision of the court. From that decree Jefferson J. Greene and Langford R. Greene, two brothers of deceased, appealed to the Supreme Court, and various other parties assigned cross errors. The Supreme Court transferred the record to this court. Hitchcock v. Greene, 252 Ill. 519. The amount involved exceeded $100,000.

The statute of 43 Elizabeth, chapter 4, commonly called the statute of charitable uses, is in force in this state. Heuser v. Harris, 42 Ill. 425; Hunt v. Fowler, 121 Ill. 269; Grand Prairie Seminary v. Morgan, 171 Ill. 444; Hoeffer v. Clogan, 171 Ill. 462. This statute is set out in 3 Starr & Curtis, 4047-9 and an abstract of it is given in 2 Perry on Trusts, 4th Ed. sec. 692, note 2. Many other uses, not within the strict letter of that statute, but which come within its spirit, equity and analogy, are treated by the courts as charitable uses. In every state of the Union where that statute is in force, a gift to charity is never allowed to fail for want of a person or corporation, definitely named, to execute the gift. Language in a will may be so indefinite as to the person to take, where the gift is intended to be to a person, that it will be held invalid, but it will not be permitted to fail where the gift is

intended for a charity. The term "missions" has a definite meaning, which has often been expressed by the courts. It is thus defined in Domestic and Foreign Missionary Society's Appeal, 30 Pa. St. 425:

"The word 'mission' is well understood in common language. For more than forty years the different American churches have been engaged in establishing and maintaining missions in various parts of the heathen world. Hardly a religious denomination exists which is not employed in one or more such benevolent enterprises. The purpose is to civilize, christianize and educate the natives of those countries where the missions are established. This is accomplished by preaching, oral instruction and by schools. In the work, persons sent out by the churches in this country, as well as native assistants, are employed and they are supported and controlled by the churches at home. The whole machinery of the work at the selected spot in a foreign land is called a mission. It is, in fine, a Christian school." ·

To the like effect are Bruere v. Cook, 63 N. J. Eq. 624; Bulkeley v. Worthington Ecclesiastical Society, 78 Conn. 526, 534. A gift for a religious purpose is a gift to a charity. French v. Calkins, 252 Ill. 243, 258, A gift to the poor is also a charity. Heuser v. Harris, supra; Hunt v. Fowler, supra; Grand Prairie Seminary v. Morgan, supra; Kemmerer v. Kemmerer, 233 Ill. 327.

Wherever there is a mistake or an uncertainty as to the name of the person or body intended to take a charity, every claimant of the fund has the right to require that the court called upon to construe the language used shall, by extrinsic evidence, place itself in the position of the testator or donor, the meaning of whose language the court is called upon to declare. The gift here in question is claimed to be void because it is to a purpose and not to a trustee or a corporate body. In Woman's Union Missionary Society v. Mead, 131 Ill. 338, besides various incorrect and insufficient descriptions of donees of charities, was one gift to

"the fund for disabled ministers of the Presbyterian Church." This, by its terms was a gift to a purpose and not to a trustee or a corporate body. It was there determined that that particular gift should be paid to "The Presbyterian Board of Relief for disabled ministers and the widows and orphans of deceased ministers." In establishing a rule which admitted evidence which led to that conclusion, the court said:

"It was unquestionably competent for these various claimants to prove their corporate existence, and the objects and purposes for which they were organized; the knowledge, if any, which testatrix had of them, and her feelings and relations towards them; the name or names by which she or others were accustomed to designate them; that no other corporations, associations or societies corresponding to the name or description given in the will existed at the time it was executed; her family, church and social relations—in short, every fact and circumstance surrounding her and these claimants, which would aid the court in reaching a conclusion as to her motives and purposes in using the names or descriptions in question. If such evidence makes it clear that these claimants were intended by testatrix to be made the objects of her bounty, then it must be held that she has expressed her intention with sufficient certainty."

Many cases are cited in that opinion which sustain the rule there established. A similar question was discussed in Gilmer v. Stone, 120 U. S. 586. The court there said:

"It is agreed in the case that the Baptist, Methodist, Episcopal, and other churches, like the Presbyterian Church in the United States of America, have boards of home and foreign missions; consequently, it is contended, the eleventh clause of the will is void for uncertainty as to the donee and the purposes of the gift. In this view we do not concur. It is undoubtedly the rule, in respect to the testamentary disposition of property, real and personal, that uncertainty either as to the subject or object of a devise will be fatal to its validity. But that rule has no application here;

for, if there were no other fact in the case than that there are numerous boards which may be generally described by the words, the 'board of foreign missions,' and 'the board of home missions,' the devise in the eleventh clause would not fail. With respect to charities, gifts may be good which, with respect to individuals, would be void; 'and where there are two charities of the same name the legacy will be divided between them, if it cannot be ascertained which was the intended object.' ''

After stating that there were certain gifts to the Presbyterian Church in the will, the court said:

''And there was extrinsic evidence to the following effect: that the testator had been for many years a member and ruling elder of the Irish Grove Presbyterian Church, one of the local congregations of the Presbyterian Church in the United States of America; that collections were annually taken up in that congregation for the various boards of that church, including its Boards of Foreign and Home Missions; that while it was announced from the pulpit that collections would be taken for the Board of Foreign Missions or the Board of Home Missions, without, in words, naming the Presbyterian Church, all such collections, with the knowledge and assent of the church session, of which the testator was an active and zealous member, were, without exception, sent to the officers of the Presbyterian Boards of Foreign and Home Missions in New York City, and regular reports thereof made to the session; that the testator took especial interest in the work of those particular Boards and uniformly contributed thereto; and that he did not, so far as his pastor or associates in the church session knew, make contributions to the societies of any other church, except to the Bible Society which was sustained by several religious organizations. Of the competency of this evidence there can be no doubt. The purpose of it was to place the court, as far as possible, in the situation in which the testator stood, and thus bring the words employed by him into contact with the circumstances attending the execution of the will. Such proof does not contradict the terms of that

instrument, nor tend to wrest the words of the testator from their natural operation. It serves only to identify the institutions described by him as 'the Board of Foreign and the Board of Home Missions;' and thus the court is enabled to avail itself of the light which the circumstances in which the testator was placed at the time he made the will would throw upon his intentions."

This rule has the support of many other cases and text books. See 3 Elliott on Evidence, sec. 2225; Tilton v. American Bible Society, 60 N. H. 377; Button v. American Tract Society, 23 Vt. 336; Faulkner v. National Sailors' Home, 155 Mass. 458; Bristol v. Ontario Orphan Asylum, 60 Conn. 472; Goodwin v. New Church Board of Publication, 160 Ill. App. 483.

Upon the question of the intention of the testatrix in the use of the words concerning home missions and foreign missions in the 22nd clause of her will, the evidence tended to establish the following facts. Mrs. Rose had lived for many years in the village of Dunlap. It contained a Presbyterian, a Methodist and a Roman Catholic Church. She had been a member of the Presbyterian Church in Dunlap, known as the Prospect Church, for more than forty years and was its principal supporter and was actively interested in all its charitable works. She was an earnest supporter of the home and foreign missions of the Presbyterian Church. Three collections were taken each year in the Prospect Church for foreign missions and two for home missions, each after previous notice from the pulpit. She gave from $5.00 to $10.00 at each of those collections, and this was regarded as a large contribution in that village. If she was unable to be present when the collection was taken, she sent the money afterwards. She did not name as executor any relative, but instead, Burton A. Hitchcock, who was one of the elders of that church who took those collections. More than thirty years before her death, the women of the Prospect Church organized themselves into a woman's society of the Presbyterian

Church. Mrs. Rose was a charter member of that so-
ciety and remained a member till her death. Contri-
butions to the cause of home missions and of foreign
missions of the Presbyterian Church were made at
each monthly meeting and at an annual meeting, and
Mrs. Rose was the most liberal contributor. These
contributions were forwarded, respectively, to the
Board of Home Missions and to the Board of Foreign
Missions of the Presbyterian Church of the United
States of America. She also went a number of times
as a delegate to annual meetings of the Home and
Foreign Missionary bodies of the Presbyterian
Churches of the Northwest. She attended one meet-
ing of the General Assembly of the Presbyterian
Church at Los Angeles, California, and other like
meetings at Winona Lake, Indiana. In these meetings
the Home Missions and the Foreign Missions of the
Presbyterian Church were prominent subjects of con-
sideration and discussion. All her contributions to
Home and Foreign Missions of the Presbyterian
Church were made through the respective boards which
had charge of those missions. It was proven and not
contradicted that, among the membership of the Pros-
pect Church at Dunlap, when contributions to home
or foreign missions were spoken of, the names of the
respective boards were not expressed in the announce-
ments, but that whenever the words "foreign mis-
sions" were used, it meant and was always understood
to mean, the Board of Foreign Missions of the Pres-
byterian Church, and the words "home missions"
were understood to mean the Board of Home Missions
of the Presbyterian Church. There was evidence in-
troduced by the heirs at law, that Mrs. Rose had fre-
quently contributed to the Methodist Church at Dun-
lap, and had conferred with a pastor of that church as
to the methods of that church in expending money for
missions and for a certain training school for teach-
ers in Chicago, and that she attended the Methodist
Church when there were no services at the Presbyte-

rian Church, and that she was assisting a Methodist young woman who had gone as a foreign missionary, but we think this does not detract from the force of the evidence above stated. We think it clear from this evidence that by the language used by Mrs. Rose in the 22nd clause of her will, she meant to give to the Board of Home Missions of the Presbyterian Church in America and to the like Board of Foreign Missions. Their charters were put in evidence. It is clear from the evidence and from authorities above cited that the missionary work of the different denominations is performed by boards which are corporate bodies, devoted to particular branches of the work, some to home missions and some to foreign missions; and that wherever the statute of 43 Elizabeth, chapter 4, is in force, a gift to home missions of a particular denomination will be construed to be a gift to the Board of Home Missions of that particular denomination, and the same of a gift to foreign missions, and that the gift will not be allowed to fail because the legal corporate name of the board was not stated. The court below therefore properly held that the missionary bodies in question took under the 22nd clause.

The decree directed the payment of one-half of the residue to a trustee to be appointed by the court below in this or in a supplemental proceeding, to be devoted by said trustee to the education of poor children, under the supervision and control of the court below. No trustee has yet been appointed, but it seems to be supposed that some resident of Peoria county is to be appointed and the money is to be there expended. The heirs at law claim this as intestate estate. The nieces claim it under the 23rd clause of the will. The authorities of the Troy Orphan Asylum at Troy, New York, claim the fund should be paid to them. The proof shows that Mrs. Rose manifested no special interest in the education of poor children in Peoria county. There was no institution devoted to that purpose in Dunlap, where she lived, nor does there seem to

have been any necessity therefor. There was a Home for the Friendless in Peoria, which she visited but once in a long lifetime. She manifested no interest in the Bradley Polytechnic School in Peoria. A charitable work was being done among the families of flatboatmen along the Illinois River. This was not specially in the direction of the education of children, and she visited it but once. A lady in charge of that work complained to Mrs. Rose that she had spent more than she could afford, under a promise by a man in Peoria to reimburse her, which promise had not been kept, and Mrs. Rose afterwards sent her $40. This is the sum of all she did in many years concerning the education of poor children in Peoria County or in Illinois.

The Troy Orphan Asylum, of Troy, New York, was founded by charity about eighty years before the evidence was taken. Mrs. Rose and her husband had the same relatives at Troy, New York. Their ancestors were among the founders of the Troy Orphan Asylum, and other relatives contributed liberally thereto after it was founded. It was in part conducted as a charitable institution and was dependent upon gifts, and it received some aid from municipal bodies. There was oral proof that its work was the care and education of poor children, and a statute defined its corporate objects as "the relief, support and education of orphan and destitute children." Another statute provided a method by which it could receive destitute children who were not orphans. The children it took were poor, and they were educated at the asylum. A second cousin of Mrs. Rose, and of her husband also, was treasurer, purchasing agent, house accountant, and general manager of the Troy Orphan Asylum for many years and at the time of the taking of the proofs herein, and she lived within a few feet of the asylum grounds. Another relative was vice president of the institution. This will was executed on May 5, 1888. The husband of Mrs. Rose, from whom she derived most of this

property, had been raised within one-half mile of this asylum. Mrs. Rose had been raised in the western part of the state of New York, and the first part of her married life was spent at Pittsfield, Massachusetts, and afterwards they moved to Peoria county. The evidence shows at least six visits by Mrs. Rose to her second cousin, the manager of the institution, three of them before 1885, one immediately after the execution of this will in 1888, another in 1898, another in 1901. She spent about six months there on each of those visits. She endowed a bed there in memory of her husband and another in her own name. She visited the asylum substantially every day during these stays with her relative, and took a great interest in its work, including the educational part. She was accustomed to speak of the inmates of the Troy Orphan Asylum as her children. She took part in selecting the articles which were bought with a gift by another person of about $11,000 to the asylum. She discussed the subject of herself furnishing $40,000 with which to erect a building for the smaller children. She planned that this building should be erected upon land which had been obtained by the asylum from some of her own relatives. She finally concluded that $50,000 would be required to do what she wished to do. Under her solicitation the president caused an architect to prepare plans for the building, for which the asylum paid $500. The president died before the proofs were taken in this case and we are deprived of the information he might have given as to what Mrs. Rose said or did which induced him to incur this expense. When she left Troy the last time in 1901, she had agreed upon the plans and the place where the building was to be erected, and told the authorities at the asylum that she had made provisions so that the work would be done. When she was smitten with her fatal illness in the spring of 1904, she had arrangements all made to start for Troy again in a few days. During these six visits of approximately six months each, to the immediate

vicinity of the asylum, three of which were before she drafted this will and three afterwards, she manifested in many ways great interest in the asylum and in the education and care of the poor children who were its inmates. If Mrs. Rose had any poor children in mind who should share her bounty, the evidence makes it clear that it must have been the poor children in the Troy Orphan Asylum. There are many facts and circumstances in evidence showing her interest in those poor children of the Troy Orphan Asylum, and substantially no evidence showing her interest in any other poor children. She told her friends that she was going to give her property to home and foreign missions and to a school for orphan children. We conclude that, if the court below had appointed a trustee to take this fund under this will, and to invest it, and to expend the net income arising therefrom for the education of poor children through the Board of Trustees of the Troy Orphan Asylum, it would have been in accordance with the desire and purpose of Mrs. Rose upon this subject. The bill prayed for the appointment of a trustee, and this decree should make the appointment while all parties in interest are before the court. The bill also averred (record pp. 101, 102) that "said decree should define and determine the powers and duties of such trustee, and in what way, in what vicinity, and to what extent per year said fund should be expended." These requests should be complied with in the decree. This was not done.

The court so disposed of the residue under the 22nd clause of the will as to divide one-half equally between the Home Missionary Society and the Foreign Missionary Society of the Presbyterian Church, and to devote one-half to the education of poor children, this distribution being based apparently upon the meaning of the word "between." Three parties are named here and not two, for the Board of Home Missions and the Board of Foreign Missions are entirely distinct bodies. When "between" is used

with reference to more than two it has the meaning of "among." Words and Phrases Judicially Defined, 767, 768. We are of the opinion that the fund should have been divided into three equal parts. The decree construed the words "the rest of my things" in the 23rd clause of the will, to refer "exclusively to the beds, bedding, silver, furniture and personal effects of said testatrix and to no other part of her estate." The expression "and personal effects of said testatrix" is too broad as it would embrace all her personal estate, including the fund in dispute. Those words should be made to read "and other like personal effects of said testatrix." As so modified, we concur in that construction of the 23rd clause, both under the rule for the construction of instruments, known as "*ejusdem generis,*" which we think applicable to those words in the 23rd clause, and also because the 22nd clause is plainly the residuary clause of the will.

The court made certain allowances for the solicitors for the different parties. Such fees were allowed as costs in Lombard v. Witbeck, 173 Ill. 413; Ingraham v. Ingraham, 169 Ill. 432; and Woman's Union Missionary Society v. Mead, *supra.* In Ingraham v. Ingraham, *supra,* it was held that where a testator has expressed his intention so ambiguously that it is necessary to apply to a court of equity for a construction of the will, the costs of the litigation, including solicitor's fees, must be borne by the estate, and that the general residue is the primary fund for their payment. The court below refused to make an allowance to the solicitor for the Troy Orphan Asylum. In view of our conclusions on that subject, we are of opinion that a reasonable allowance should be made to him.

So far as the decree finds the Board of Home Missions and the Board of Foreign Missions of the Presbyterian Church and a trustee to be appointed for the education of poor children entitled to this fund, and so far as it directs solicitor's fees and other costs to be paid therefrom, the decree is affirmed. In other

respects it is reversed and remanded, with directions to the court below to enter another decree and therein to appoint, under an adequate bond, a trustee to receive and invest the fund for the education of poor children; to divide the residue of the estate equally between the Presbyterian Board of Home Missions, the Presbyterian Board of Foreign Missions and the said trustee of the fund for the education of poor children; and to retain control of said fund for the education of poor children and to cause it to be securely invested in interest bearing securities, and the net income thereof to be expended for the education of poor children through the Board of Trustees of the Troy Orphan Asylum at Troy, New York; and to allow a reasonable solicitor's fee to the solicitor for the Troy Orphan Asylum; and generally to enter a decree in conformity with this opinion.

*Affirmed in part, reversed in part, and remanded with directions.*